John E. BAIRD and Carolyn F. Baird, et al.,

v.

The UNITED STATES.

No. 189–78.

United States Claims Court.

May 14, 1984.

Phillip A. Cooke, Arostegui, Cooke, Marquez, Epley, Gengler & Kelter, Marysville, Cal., for plaintiffs.

Fred R. Disheroon, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge.

Plaintiffs filed this action in the Court of Claims on May 1, 1978, following denial of an administrative claim for damages. Nineteen groups of plaintiffs sought compensation from the United States for damages to their properties that allegedly were caused by the government's operation of a flood control project in the Sacramento River Valley of California.[1] Plaintiffs argue

---

1. To conserve trial time and expense, the parties agreed to present testimony and evidence concerning only the following five representative properties: The Baird property (1), the Cannell property (2), the Keller Partnership property (8), the Sanborn property (12), and the Southam property (15). The parties stipulated that the court's decision concerning these five properties would be binding for all. The record does not establish that each of the 19 plaintiffs named in the petition was in April 1974 or has been at all times since then the owner of real property

that the government's actions effected a taking of flowage or seepage easements over their property and resulted in the deaths of numerous walnut and prune trees,[2] and of other crops. The parties agreed that the issues of law and fact relating to plaintiffs' right to recover would be resolved initially, and determination of the amount of recovery, if any, would be reserved for later proceedings. That trial to determine liability occurred in San Francisco from August 4 through August 13, 1982. The pertinent facts follow.

### Background

Plaintiffs are owners of land along the Sacramento River in California. They allege a taking by the government of flowage or seepage easements over their properties, and demand compensation both for those easements and for the deaths of numerous walnut and prune trees, as well as damage to other crops. They attribute those deaths to the government's operation of the dams and reservoirs of the Central Valley Project (Project) in March and April 1974. Defendant operated the Project through the Bureau of Reclamation, Department of the Interior (Bureau). The project's primary purposes are to provide flood control, hydroelectric power generation, and water for irrigation.

The two segments of the Project of prime importance to this case are the Shasta Dam and the Trinity River Diversion (Diversion). Both are upriver from plaintiffs' properties, and plaintiffs contend it was their operation that directly caused the damages at issue. The Shasta Dam was completed and began storing water in 1944. Its reservoir is capable of holding over 4.5 million acre feet of water. Under normal conditions, it controls slightly less than two-thirds of the water flow of the Sacramento River. The remainder of the flow is primarily attributable to downstream tributaries, rainfall, ground runoff, and the Trinity River Diversion.

The Diversion was completed in 1964. Although the waters of the Shasta Dam naturally flow into the Sacramento River, the Trinity Dam is located outside the Sacramento River watershed, on the Trinity River. The Diversion brings water from the Trinity River through the Judge Francis Carr and Spring Creek powerhouses and transfers it into the Sacramento River at Keswick Dam. Keswick Dam lies below the Shasta Dam on the Sacramento River and operates largely as a regulating structure to even out the water fluctuations created by power releases from the Shasta Dam.

The Diversion's principal purposes are to store and provide water for irrigation, generation of hydroelectric power, and preservation and propagation of fish and wildlife. Although it was not specifically created as a flood control project, the Diversion operates as an integral part of the entire Central Valley Project.

The Project is an integrated flood control system which includes not only dams and reservoirs, but man-made levees, weirs and bypasses as well. The system of levees, weirs and bypasses is downstream from the Shasta and Keswick Dams. In general, the levees are designed to contain high flows of water within or relatively close to the river channel. When the water rises to a certain level, it spills over weirs that are formed into the levees and runs into designated overflow areas. The water then flows through river bypasses for final discharge into the delta. These elements of the system can be quite significant. For example, the river at the city of Sacramento can carry 100,000 cubic feet per second (c.f.s.) of water, while the bypass will carry almost 500,000 c.f.s.

From October 1973 through April 1974, substantially more rain than normal fell in the Sacramento River Valley. During that period, the procedure in effect for the flood control operation of Shasta Dam was to

---

along the Sacramento River. Ownership of the five representative properties, however, was established.

**2.** These are actually plum trees that are cultivated for the production of prunes.

hold back the peak of a major storm while the sidestream flow and runoff below the dam passed downstream, and then to release the stored water to make room for additional flood control space. This procedure reduced the peak flows in the Sacramento River, but prolonged moderately high flows following the peak.

Between April 1 and April 19, defendant made substantial releases into the Sacramento River. In normal years, such large releases during this period would not have occurred. These releases were prompted, however, by the unusually wet winter and spring, and more specifically by a severe storm that occurred in late March. From April 1 through April 3, defendant released from the Shasta Dam an average of approximately 68,000 c.f.s. of water. From April 4, when defendant released 35,362 c.f.s. of water, releases were steadily reduced to the level of 19,071 c.f.s. on April 18. On April 19, the Shasta release dropped to 10,976 c.f.s. During the same 19-day period, defendant transferred through the Trinity River Diversion approximately 3,500 c.f.s. per day. These releases from the Diversion, however, did not contribute substantially to either the Sacramento River's level or the seepage on plaintiffs' lands.

Overflow and seepage onto plaintiffs' properties occurred during this period. After the storms passed and the waters receded, plaintiffs found numerous trees in their orchards dead or dying. Plaintiffs attribute the deaths of those trees to waterlogging and contend that defendant's sustained releases from Shasta Dam and the Trinity River Diversion between approximately April 1 and April 19, 1974, were the direct cause of the overflow and seepage onto their orchards. In fact, plaintiffs contend that fewer trees would have died if defendant had not stored any of the waters from the late March storm, but instead merely let them flow into the Sacramento River. Under these circumstances, plain-

tiffs contend, the water would have been higher for a short period of time but would not have been at elevated heights for the prolonged period of approximately April 1 to April 19.[3] Plaintiffs further contend that the extended period of high water in the Sacramento resulted in the seepage that eventually caused the deaths of their trees.

The flood control releases in April were unusual in that they continued into the early spring when the trees had just broken dormancy. In prior and subsequent wet winter years, the high flows would have passed and the overflow and seepage withdrawn by the beginning of the growing season. Plaintiffs contend, however, that "[i]n 1974, the water stayed in the orchards so long into the growing season that it killed numerous trees."

Defendant counters plaintiffs' claim with three principal contentions. First, defendant questions whether its flood control releases caused the seepage and overflows onto plaintiffs' properties. Defendant notes that spring 1974 was the second wettest spring on record, and "the spring flood * * * was a 1 in 120 to 130 year storm. That storm was a unique occurrence because it occurred so late in the season." Defendant argues that much of the water in plaintiffs' orchards was not attributable to the operation of the Shasta Dam or the Trinity River Diversion. Rather,

> [s]oils of plaintiffs' properties had been subjected to high antecedent rainfall conditions for long periods of time during early 1974. Seepage is only one of several possible sources of soil saturation or waterlogging in addition to other effects from rainfall, local natural runoff, and even irrigation practices.

Second, defendant contends that a phytophthora fungus was the more likely cause of the trees' deaths than waterlogging. Defendant argues that "[a]ll of the facts that were presented would suggest that the most likely cause of damage was due to

---

**3.** Defendant points out that if the late March storm had not been stored, a number of towns would have been under considerable water and countless dollars of damage would have resulted.

pathogens in the soil that were activated by generally wet conditions throughout the winter nongrowing season." Essentially, defendant posits that the phytophthora was activated not by flood control releases in March and April 1974, but by the unusual and excessively wet conditions of the preceding winter. Rainfall, poor soil drainage, localized runoff, poor irrigation management, and river seepage from both controlled and uncontrolled water are all cited as possible contributing factors.

Plaintiffs counter that the tree deaths primarily occurred in those areas subjected to sustained high levels of water in the trees' root zones from April 1 through April 19. Resolution of this case, however, does not require a determination of the government's responsibility, if any, for the seepage, waterlogging, or phytophthora.

Finally, defendant argues that even if plaintiffs did incur some damage to their property, their lands experienced far greater benefits from the project and they are therefore precluded from recovery. Defendant specifically contends that, overall, operation of the project has resulted in substantially reduced seepage, high water peaks, and duration and frequency of floodings along the entire expanse of the valley. But again, because of the court's decision, this issue need not be resolved.

As discussed below, plaintiffs have failed to establish a taking by the government either of a flowage or seepage easement over their properties or of the damaged trees and crops. In addition, tortious damages caused by the government through the operation of a flood control project are noncompensable under 33 U.S.C. § 702c.

### Discussion

### I. Taking of Flowage Easement

■ The standard for government liability in flooding cases is well established. As the Court of Claims stated in *Fromme v. United States:*

> In a situation where works constructed by the Government on land owned or controlled by it cause the land of another to be subject to intermittent, frequent, and inevitably recurring floodings—although not to constant flooding—it is held that the Government thereby takes a flowage easement over the affected land and must pay just compensation under the Constitution for the easement. *United States v. Cress,* 243 U.S. 316, 318, 328–29 [37 S.Ct. 380, 385, 61 L.Ed. 746] (1917).

188 Ct.Cl. 1112, 1118, 412 F.2d 1192, 1196 (1969); *see also Barnes v. United States,* 210 Ct.Cl. 467, 474–75, 538 F.2d 865, 870 (1976); *Hartwig v. United States,* 202 Ct.Cl. 801, 809, 485 F.2d 615, 619–20 (1973).

■ The taking need not be caused by direct flooding, however. The government may effect a taking by merely preventing the land from draining as it would have if left in its natural state, or by seepage through rising ground water. *See, e.g., Barnes v. United States,* 210 Ct.Cl. at 475, 538 F.2d 865. In all instances, however, the *Barnes* court noted that flooding "must be frequent ... and productive of substantial damage." *Id.* In addition, although the plaintiffs need not prove that the government intended to take their property, the flooding must be the natural and probable consequence of the government's action. *Id.* at 476, 538 F.2d 865; *see also Bettini v. United States,* 4 Cl.Ct. 755 at 759 (1984).

■ Among the issues now before the court is whether plaintiffs have proved that the government's operation of the Shasta Dam and Trinity River Diversion has resulted in both frequent and inevitably recurring flooding of their lands. Damages from government-induced flooding that cannot be deemed permanent merely give rise to a claim in tort. *Barnes v. United States,* 210 Ct.Cl. at 475, 538 F.2d 865; *Hartwig v. United States,* 202 Ct.Cl. at 810, 485 F.2d 615. In that instance, no taking has occurred, and, as discussed below, tortiously inflicted damages resulting from the operation of a federal flood control project are noncompensable under 33 U.S.C. § 702c.

■ Whether the frequency and inevitability of flooding effects a taking requires a fact determination, based in part on the character and use of the land. Previous cases provide some guidance, however. In *Barnes,* the court found a taking of lands dedicated to annual crops when the parties stipulated that flooding, seepage, or impaired drainage of plaintiffs' lands occurred in five out of the previous seven years. 210 Ct.Cl. at 472–74, 538 F.2d 865. The parties additionally stipulated that this situation would continue indefinitely. Similarly, the court in *King v. United States,* 192 Ct.Cl. 548, 427 F.2d 767 (1970), found a taking when flooding of plaintiffs' property, which had previously been intermittent, now occurred almost annually.

Plaintiffs who have established less frequent flooding, however, have been denied recovery. In *Fromme,* the plaintiff established that interference with the drainage of her crop and pasture land "can be expected to recur at intervals of about once in every 15 years, on the average." 188 Ct.Cl. at 1119, 412 F.2d 1192. The court held that "the future prospect of intermittent and frequent floodings" was lacking, and therefore the government had taken no flowage easement. *Id.* Similarly, in *Bryant v. United States,* 216 Ct.Cl. 409, 578 F.2d 1389 (1978), the court granted the government summary judgment upon finding that the flooding of plaintiffs' property would occur only at intervals of about once in every 30 years.

■ In the present case, plaintiffs established only one instance of flooding damage since the government began operating this project: the flooding in spring 1974, now at issue. Plaintiffs allege no prior or subsequent flooding damage due to the government's operation of the Shasta Dam and Trinity River Diversion. In addition, defendant presented some testimony that the likelihood of flooding as late in spring as the sort that damaged plaintiffs' orchards has a probability of occurrence of once every 120 to 130 years.

■ A one-time occurrence, such as this, could only be compensable through an action in tort. *See Barnes v. United States,* 210 Ct.Cl. at 475, 538 F.2d 865. Actions in tort are beyond this court's jurisdiction. *Id.* Furthermore, as discussed below, 33 U.S.C. § 702c specifically preserves the sovereign's immunity from any damages resulting from the operation of a federal flood control project.

## II. *Damage to Plaintiffs' Trees*

### A. *Taking Claim*

Plaintiffs have also alleged that the government's sustained releases into the Sacramento River resulted in the deaths of numerous prune and walnut trees, as well as other crops. At issue is whether those losses might be compensable.

■ Several well-established principles are important to this decision. First, the United States may be liable only for those flood damages that are "the direct, natural or probable result of an authorized [governmental] activity and not the incidental or consequential injury inflicted by the action." *Columbia Basin Orchard v. United States,* 132 Ct.Cl. 445, 450, 132 F.Supp. 707 (1955); *see also Hartwig v. United States,* 202 Ct.Cl. at 809, 485 F.2d 615, and cases cited therein. Essentially, the court must determine whether plaintiffs' damages resulted from a tortious invasion of their property rights, or "rises to the magnitude of an appropriation of some interest in [their] * * * property permanently to the use of the Government." *National By-Products, Inc. v. United States,* 186 Ct.Cl. 546, 577, 405 F.2d 1256, 1273–74 (1969). And, as the Supreme Court noted, "it is the *character* of the invasion, not the amount of damage which results from it" that determines whether a taking occurred. *United States v. Cress,* 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917) (emphasis added).

■ Plaintiffs must also prove "an intent on the part of the defendant to take plaintiff's property or an intention to do an act the natural consequence of which was to take its property." *Columbia Basin*

*Orchard v. United States*, 132 Ct.Cl. at 450, 132 F.Supp. 707; *see also Bettini v. United States*, at 760; *Berenholz v. United States*, 1 Cl.Ct. 620, 626–28 (1982), *aff'd*, 723 F.2d 68 (Fed.Cir.1983). The government's "intent * * * to appropriate the property to the use of the public, or to deprive the owner of the beneficial use of it for the benefit of the public," *see Columbia Basin Orchard v. United States*, 132 Ct.Cl. at 452, 132 F.Supp. 707, may be inferred. As *Bettini* and *Berenholz* note, it is the "likelihood of the outcome" of the government's action that distinguishes its takings from its torts. *Bettini v. United States*, at 760; *Berenholz v. United States*, 1 Cl.Ct. at 628.

Essentially, therefore, the probability and foreseeability of the damage is a primary determinative element in whether a taking or tort occurred. In *Berenholz*, for example, the Army Corps of Engineers breached plaintiff's dike to permit repairs on another dike essential to the safety of a neighboring town. The Corps' subsequent repair of plaintiff's dike was ineffective, the rebuilt section eroded, and plaintiff's land was permanently flooded. The court determined that the Corps knew or should have known at the time it breached plaintiff's dike that the breach would be irreparable. The flooding was the probable and foreseeable result of the Corps' actions, and therefore a taking occurred.

■ In contrast, plaintiffs in the present case have established no more than damage due to " 'a random event induced more by a natural phenomenon than by Government interference' [for which] there can be no taking, even if there is permanent damage to property partially attributable to Government activity." *Id.* at 626. This case involves a unique occurrence that grew out of unusual climatic conditions. The excessively wet winter and spring and the surprisingly late and heavy March storm directly caused much of the soil saturation and seepage to which plaintiffs attribute their damages.

In addition, although there may be compensation for damages to trees and crops when the government has taken a flowage or seepage easement over real property, damages unrelated to a taking of the realty have been found noncompensable in this court. *See, e.g., Fisackerly v. United States*, 212 Ct.Cl. 585, 586, 553 F.2d 104 (1977); *Barnes v. United States*, 210 Ct.Cl. at 481–83, 538 F.2d 865; *cf. King v. United States*, 192 Ct.Cl. 548, 427 F.2d 767. In *Barnes*, the government had taken a flowage easement over plaintiffs' property in November 1973. Previous floodings and crop destruction by the government had occurred from 1969 to the date of taking. When assessing the elements includable in plaintiffs' recovery, the court allowed, as a separate element of damages, the value of mature crops destroyed at the time of taking. However,

> [a]t best, crop damages sustained prior to the date of taking mentioned above are the product of tortious invasions—mere trespasses. Such damages are not recoverable in this court in any event. 28 U.S.C. § 1491 (1970). Not until the date of taking did these several tortious invasions ripen to the extent necessary to confer on the defendant a flowage easement. For damages sustained prior to that moment, we have no statutory jurisdiction.

210 Ct.Cl. at 482–83, 538 F.2d 865.

Similarly, the plaintiff in *Fisackerly* sought compensation for destruction of her crops in the three years preceding the government's taking of her land. Finding *Barnes* controlling and citing the language quoted above, the Court of Claims dismissed plaintiff's petition as sounding in tort. 212 Ct.Cl. at 586, 553 F.2d 104.

Certainly, as the Court of Claims noted, "[b]oth personal and real property are within the protection of the Fifth Amendment." *King v. United States*, 192 Ct.Cl. at 552, 427 F.2d 767. However, the court also had determined that, in flooding cases such as ours, no taking of crops occurs until the government has taken a flowage easement for the underlying property as well. *Fisackerly v. United States*, 212 Ct.Cl. at 586, 553 F.2d 104; *Barnes v.*

*United States,* 210 Ct.Cl. at 481–83, 538 F.2d 865. Crop damages due to flooding without the taking of an easement are characterized as tortious invasions, non-compensable in this court. Even in *King,* where the court acknowledged the possibility of a taking claim for destroyed crops, those crops were taken with the underlying realty. And the court's analysis turned on plaintiffs' proof of frequent, inevitably recurring floods (*i.e.,* of the government's taking of a flowage easement).

### B. *Reclamation Act*

Although the court determines that no taking of plaintiffs' trees occurred under the federal constitution, it must also address a separate, statutory argument. Plaintiffs argue that the comparatively liberal inverse condemnation standards of California law, rather than established federal standards, should apply in determining the government's liability for damages to their trees.[4] In constructing this argument, plaintiffs first posit that the government's operation of the Shasta Dam and the Trinity River Diversion implicated the Reclamation Act of 1902. Specifically, plaintiffs contend that defendant violated § 8 of the Act, now codified at 43 U.S.C. § 383. That section provides:

> Nothing in * * * this title shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of such sections, shall proceed in conformity with such laws,

and nothing in such sections shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof. June 17, 1902, c. 1093, § 8, 32 Stat. 390.

Based on this section, plaintiffs argue, "here, where the Bureau of Reclamation has intentionally operated the dam in a manner for the benefit of many to the detriment of the plaintiffs, that, if in doing so it has violated the state water law, the plaintiffs may be entitled to compensation." Plaintiffs vastly overstate the scope of the Reclamation Act, however. That act has no application to the present case.

The scope and history of the act, and specifically of § 8, are discussed in detail by the Supreme Court in *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). The court found that Congress had limited intentions in enacting the Reclamation Act. The Court noted, "In that Act, Congress set forth on a massive program to construct and operate dams, reservoirs, and canals for the reclamation of the arid lands in 17 Western States." *Id.* at 650, 98 S.Ct. at 2988.

The issue of choice of laws concerning condemnation of property interests involved only the appropriation of water and of water rights. The court stated:

> From the legislative history of the Reclamation Act of 1902, it is clear that state law was expected to control in two important respects. First, and of controlling importance to this case, the Secre-

---

**4.** Summarizing their arguments on this point, plaintiffs state:

> Whether it is called damage, detriment, or a total taking or a taking of an easement, the fact is that the plaintiffs have all suffered detriment to their lands by the substantial number of trees killed in their orchards. We have shown that the acts of the Bureau of Reclamation employees were a substantial cause of that detriment. In such a case in the state of California, it would appear the law supports a finding for inverse condemnation. The California constitution, art. I, § 14, requires compensation for the taking *or damaging*

of private property for public use. This contrasts markedly with the fifth amendment to the federal constitution, which provides only that private property shall not "be taken for public use, without just compensation." *Cf. Bettini v. United States,* at 759–60 (California constitution provides more liberal causation standards for compensable takings than fifth amendment). The California constitution thus blurs the distinction found in federal law between recovery for the government's taking and for its tortious damage of property. *See, e.g., Weck v. L.A. County Flood District,* 80 Cal.App.2d 182, 181 P.2d 935, 948 (1947).

tary would have to appropriate, purchase, or condemn necessary water rights in strict conformity with state law. \* \* \* \* The Secretary of the Interior could not take any action in appropriating the waters of the state streams "which could not be undertaken by an individual or corporation if it were in the position of the Government as regards the ownership of its lands." H.R.Rep. No. 794, 57th Cong., 1st Sess., 7–8 (1902).

\*     \*     \*     \*     \*     \*

Second, once the waters were released from the Dam, their distribution to individual landowners would again be controlled by state law.

*Id.* at 665, 667, 98 S.Ct. at 2996, 2997. The present case involves neither the appropriation of water and water rights nor a plan for distribution of the same under an arid land reclamation program. The Reclamation Act of 1902 is inapposite.

An argument similar to plaintiffs' was considered and rejected by the Court of Claims in *Sherrill v. United States,* 180 Ct.Cl. 914, 381 F.2d 744 (1967). In that case, plaintiffs' land had fronted the Colorado River. In 1957, however, the federal government moved the river channel to the west to improve navigation, thereby destroying plaintiffs' riparian right of access to the water. The government's action was pursuant to the Act of June 28, 1946, ch. 517, 60 Stat. 338, which had been enacted "for the purpose of controlling the floods, improving navigation, and regulating the flow of the Colorado River." 180 Ct.Cl. at 919, 381 F.2d 744. The court contrasted this purpose with that of the Reclamation Act and found that, despite reference to the Reclamation Act in the 1946 statute, plaintiffs had "no right to compensation apart from a right under the Fifth Amendment." *Id.* Since the federal constitution provided no basis for compensation, plaintiffs' petition was dismissed. *Id.* at 920, 381 F.2d 744.

Similarly, the governmental action in the present case is clearly distinct from that

contemplated by the Reclamation Act. Therefore, barring statutory exception, the established rule applies that "the issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law." *Bartz v. United States,* 224 Ct.Cl. 583, 592, 633 F.2d 571, 577 (1980). As previously noted, no such taking occurred.

C. *Immunity Under 33 U.S.C. § 702c*

The Flood Control Act of 1928 introduced the immunity provision determinative of the issue of governmental liability for tortious damages in this case. That provision is now codified at 33 U.S.C. § 702c. Section 702c states, in pertinent part: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place \* \* \*." The legislative history of that section, as well as the subsequent development of its immunity provision in the case law, was discussed at great length and in detail by Judge MacBride of the United States District Court for the Eastern District of California, in *Morici Corp. v. United States,* 491 F.Supp. 466 (E.D.Cal. 1980), *aff'd,* 681 F.2d 645 (9th Cir.1982). That case, coincidentally, concerned many facts and issues identical to those now before this court.

In *Morici,* plaintiff filed its claim for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, alleging negligence by the Bureau of Reclamation in its operation of the dams and reservoirs of the Central Valley Project. Between March 25 and April 10, 1974, the Bureau's discharges from the reservoirs allegedly raised the levels of the Sacramento River and the water table, causing seepage into the plaintiff's cultivated lands. Plaintiff argued that the Bureau's operation of the project resulted in the destruction of 2,700 fruit and nut trees, as well as damage to various crops. The government urged dismissal of the complaint, arguing that § 702c "immunizes the United States from damage actions arising from the operation of such a [flood control] project." 491 F.Supp. at 468.[5]

---

**5.** The immunity provision in § 702c, of course,    does not bar an action for taking under the

All but one of the United States courts of appeals that have considered the scope of § 702c have found the government immune from liability when the actions or failures involved a flood control project. *See, e.g., Portis v. Folk Construction Co.,* 694 F.2d 520, 523 (8th Cir.1982); *Morici Corp. v. United States,* 681 F.2d at 648; *Pierce v. United States,* 650 F.2d 202, 203 (9th Cir. 1980); *Callaway v. United States,* 568 F.2d 684, 686–87 (10th Cir.1978); *Florida East Coast Rwy. Co. v. United States,* 519 F.2d 1184, 1191–92 (5th Cir.1975); *Parks v. United States,* 370 F.2d 92, 93 (2d Cir. 1966). This court, in *Berenholz v. United States,* by negative inference agreed with this line of cases when it noted that, in any event, the government's action in *Berenholz* could not be immunized by § 702c because it "was not part of a comprehensive flood control project." 1 Cl.Ct. at 628 n. 1.

As the Ninth Circuit held in *Morici,* "[i]t is the relationship between the flooding and a project Congressionally authorized for flood control which is the controlling factor." 681 F.2d at 648; *see also Pierce v. United States,* 650 F.2d at 203 (damages to property from backwater caused by impoundment of flood waters behind flood control dam noncompensable under § 702c); *cf. Peterson v. United States,* 367 F.2d 271, 275 (9th Cir.1966) (dynamiting ice jam to alleviate flooding on Air Force Base held unrelated to any act of Congress authorizing expenditure of federal funds for flood control; § 702c therefore no bar to recovery). More recently, the Eighth Circuit held, in affirming the district court's grant of summary judgment to the government based on § 702c, "As we have determined that this is a flood control project, * * * there is no question but that the government is immune." *Portis v. Folk Construction Co.,* 694 F.2d at 523. Only the Fourth Circuit has diverged from this view. *See Hayes v. United States,* 585

F.2d 701, 703 (4th Cir.1978) (immunity under § 702c depends on "the purpose or purposes for which waters had been released"; federal project at issue had dual purpose of flood control and recreation). As support for its holding, the Ninth Circuit in *Morici* reasoned:

The difficulties and uncertainties of proof inherent in identifying the particular purpose of an employee's conduct at any given time in connection with a large multipurpose project further support our position that immunity under 702c should be determined by the overall purposes intended by Congress for the project, not the particular intent of a government employee at a specific time.

681 F.2d at 648.

■ This court previously indicated, in *Berenholz,* that it would follow the majority view when assessing a governmental claim of immunity under § 702c. Either view, however, would support the finding in this case that the tortious destruction of plaintiffs' trees by the government's operation of the Shasta Dam and Trinity River Diversion would be noncompensable under § 702c. The government's sustained release of flood waters into the Sacramento River was undeniably part of a Congressionally authorized flood control project. Nor do plaintiffs contest the government's assertion that the floodwater releases were made at least in part for the purpose of flood control. Section 702c, therefore, bars any claim of tortious damage to plaintiffs' orchards in this case. The court ventures no opinion, however, as to whether the government's actions actually caused or contributed to the deaths of plaintiffs' trees and other crops. Even if plaintiffs proved government responsibility, their damages would be noncompensable.

### Conclusion

The court determines that the government took no flowage or seepage easement

Constitution. *Berenholz v. United States,* 1 Cl.Ct. at 629 n. 1 (court found "since this case involves a taking, the question of § 702c immunity does not arise"). As Justice Holmes noted, "If what is done does amount to a taking, of

course, if the statute gives no compensation, an action can be maintained, since the legislature cannot authorize property to be taken without being paid for." *Lincoln v. Commonwealth,* 164 Mass. 368, 41 N.E. 489, 490 (1895).

over plaintiffs' property. Nor did the government's actions rise to the level of a taking of plaintiffs' trees and other crops for which compensation is due under the fifth amendment. Plaintiffs have presented no more than an action in tort for damage to their orchards, and pursuant to 33 U.S.C. § 702c, tortious damages caused by the government in its operation of a flood control project are not compensable.