### 18457

David LINDSEY, Respondent, v. CITY OF GREENVILLE, Greenville Water Works, H. Cleveland Beattie, George E. McCoin, J. Ed Hart, David G. Traxler, as Mayor, and Gus Smith, as Alderman, as Commissioners of Public Works of Greenville, South Carolina, Appellants.

(146 S. E. (2d) 863)

*Messrs. Rainey, Fant & Horton,* of Greenville, *for Appellants,*

*Charles W. Spence, Esq.,* of Greenville, *for Respondent,*

February 8, 1966.

LEWIS, Justice.

This is an appeal by the defendant from a verdict awarded to the plaintiff, in the amount of $3,000.00, for the destruction of plaintiff's bean crop in June 1961, by flood waters released in the operation of defendant's large dam and reservoir on North Saluda River in Greenville County. Recovery was based upon the alleged unlawful taking of plaintiff's property by the defendant without just compensation in violation of Article 1, Section 17, of the South Carolina Constitution.

During the trial of the case the defendant moved for a directed verdict in its favor upon the ground that the evidence conclusively showed that there was no taking of plaintiff's property for a public use within the meaning of the foregoing constitutional provision. The motion was refused, as was a subsequent motion upon the same ground for judgment notwithstanding the verdict. An alternative motion was also made, and refused, for a new trial upon the ground that the trial judge committed prejudicial error in his rulings as to the admissibility of certain testimony. The exceptions assign error in the refusal of the foregoing motions.

The first question for determination is whether the defendant was entitled to a directed verdict upon the ground that the evidence failed to show a taking of

plaintiff's property for a public use within the meaning of Article 1, Section 17, of the South Carolina Constitution, which provides in part as follows: "Private property shall not be taken for * * * public use without just compensation being first made therefor." If there was any evidence to sustain the conclusion that there was such taking of plaintiff's property, the motion was properly denied.

In determining the foregoing question, the testimony and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the plaintiff.

The defendant, City of Greenville, constructed, as a part of its water system, a large earthen dam across the North Saluda River in a mountainous area of Greenville County, creating a reservoir of approximately one thousand eighty (1080) acres of water surface at spillway level. The dam was completed on November 6, 1958, and, after the subsequent construction of a treatment plant and a pipeline to the city, the system was put in operation on January 31, 1961.

In the construction of the foregoing project, provision was made for the discharge of water from the reservoir or lake through a 72 inch pipe laid through the bottom of the dam and also over an off-set spillway. Waters passing through the pipe followed the riverbed below the dam, the amount of such discharge being controlled by valves or gates in the pipe which could be opened or closed as the occasion required. Any water passing over the spillway emptied into a canal which connected with the river about 3840 feet below the dam. While the discharge of water through the pipe was controlled by those in charge of the project, no water passed over the spillway except at such times as the rise of the lake level forced it through this outlet.

The plaintiff, a resident of the area for many years, leased from his mother for 1961 a tract of farm land lying below defendant's dam and along the North Saluda River. The

farm was located between the dam and the intersection of the river with the spillway canal. The plaintiff planted beans on the farm in a low lying field adjacent to the river. The crop had matured and was ready for harvesting when destroyed in June, 1961, by flood waters under the conditions hereinafter related.

The evidence shows that a heavy general rainfall began in the area about noon on Tuesday, June 20, 1961, and continued until about 3:30 p. m. on Wednesday, June 21st, a period of about 28 hours. The nearest official U. S. Weather Station recorded a total of 5.89 inches of rain during the period. The record indicates that there was probably a greater rainfall at places within the North Saluda River watershed above defendant's dam. There was testimony, however, that the rainfall during this period was not unprecedented in the area.

As a result of the heavy rainfall, the water level in the reservoir began to rise rapidly. There was also testimony that a smaller dam, located within the defendant's reservoir and forming a lake of about twelve to fifteen acres, broke during the period, further contributing to some extent to the rise of the water level. In order to maintain the desired level, the defendant began discharging large amounts of water through the pipeline at the bottom of the dam. For a short period of time the lake level rose to the point where water was also passing over the spillway. As a result of the large volume of water discharged from the reservoir, flooding of plaintiff's crop began on Wednesday afternoon or night and continued until the defendant closed the discharge pipeline late Thursday afternoon, a period of approximately twenty hours. Such flooding ended within about two hours after the defendant stopped discharging water in large quantities from its reservoir.

It is undisputed that the lands upon which plaintiff planted his bean crop had been subject to flooding in the past when large rains occurred. There was testimony however that,

apparently due to the mountainous area, the runoff was rapid and flooding had never lasted over two to four hours, with no appreciable damage to crops. It is inferable from the record that, because of the discharge of large quantities of water from defendant's dam over a long period of time, plaintiff's crop was flooded for approximately twenty (20) hours under hot weather conditions and that such long period of flooding caused the crop to die, whereas short periods of flooding, as in the past, would not ordinarily have such effect.

The foregoing fairly summarizes the testimony, viewed in the light most favorable to the plaintiff, which we consider material to a determination of whether there was any evidence to support the conclusion that there was a taking of plaintiff's property for public use in the constitutional sense.

The defendant first takes the position that the flooding of plaintiff's land was temporary, not likely to occur again, and therefore lacking the element of permanency necessary to constitute a taking in the constitutional sense. The case of *Collins v. City of Greenville,* 233 S. C. 506, 105 S. E. (2d) 704, is relied upon to sustain this contention. We quoted with approval in that case the following from *Gasque v. Town of Conway,* 194 S. C. 15, 8. S. E. (2d) 871, 874:

"Ordinarily the constitutional provision under consideration contemplates compensation for a 'taking' or for damage which is permanent or presumably of a permanent nature, and growing out of a positive act or aggressive step. It was never intended to furnish a cause of action for every error of judgment committed or wrongful act perpetrated by a town council."

In *Collins* the plaintiff sought to recover damages to his property when a city owned sanitary sewer line became clogged, causing sewage to back up and overflow the commodes in plaintiff's buildings. We held that the damages sustained by plaintiff from the blocking of the sewer line did not constitute a taking for public use within the meaning

of Article 1, Section 17, of the Constitution, since the acts complained of were of a temporary nature and constituted only "a single isolated instance" arising from no positive act of the city. The damages there did not result from a situation basically permanent in nature.

In *Chick Springs Water Co. v. State Highway Department,* 159 S. C. 481, 157 S. E. 842, it was held (quoting from 10 R. C. L., p. 70, Sec. 61) :

"There may be a taking of property in the constitutional sense although there has been no actual entry within its bounds and no artificial structure has been erected upon it. When a public agency acting under authority of statute uses land which it has lawfully acquired for public purposes in such a way that neighboring real estate, belonging to a private owner, is actually invaded by superinduced additions of water, earth, sand or other material so as effectually to destroy or impair its usefulness, there is a taking within the meaning of the constitution."

The facts here are distinguishable from those in *Collins.* We think the evidence sustains the conclusion that the flooding and destruction of plaintiff's crop constituted a taking within the meaning of the Constitution. The discharge of excess water from the reservoir was an integral and necessary part of the defendant's operation and required for the protection of the project. The rains which necessitated the discharge of water in large volume from the reservoir were not unprecedented in the area and, admittedly, will in all probability occur again. In the operation of its project and in order to protect it from the excess accumulation of water in its reservoir, the defendant opened the flood gates to its dam, thereby flooding and destroying the crops of the plaintiff. It is reasonably inferable that in the normal operation of defendant's project such discharge of waters from its reservoir will be repeated in the future. These circumstances constituted a "taking" in the constitutional sense.

The defendant contends however that there was no taking for a *public use* so as to entitle the plaintiff to recover. It is conceded that the construction, operation and maintenance of the dam and reservoir by the defendant was a public use. The damages sustained by the plaintiff resulted from the operation of such project. Under these circumstances, the damages sustained by plaintiff constituted a taking for public use. As stated in *Boitano v. Snohomish County,* 11 Wash. (2d) 664, 120 P. (2d) 490: "The taking or damaging of property to the extent that it is reasonably necessary to the maintenance and operation of other property devoted to a public use is, likewise, a taking or damaging for a public use."

Finally, the defendant contends that there was no taking of plaintiff's property because the evidence fails to show that the discharge of water from its dam constituted a proximate cause of plaintiff's damage. It is the defendant's position that the evidence conclusively shows that the discharge of waters from its reservoir created no greater valume of flowage below the dam than would have occurred under normal conditions of heavy rainfall without the presence of the dam.

The testimony shows that the lands upon which plaintiff planted his crops had been subject in the past to overflow from the river in periods of heavy rainfall. Witnesses who lived in the area testified, however, that over a period of forty years flooding had never lasted over two to four hours at any one time; whereas at the time in question, with no greater rainfall than had been previously experienced, flooding continued for a period of approximately 20 hours, ending within about two hours after the flood gates in defendant's dam were closed. There is also testimony that flooding of the crops for short periods, as in the past, did not result in any appreciable damage, but that prolonged flooding under hot weather conditions, as was the case at the time in question, would result in destruction of the crops.

We think that it is reasonably inferable from this record that the destruction of plaintiff's crop resulted not from the

mere fact of flooding, but directly and proximately from the accumulation of flood waters in the defendant's reservoir and discharging them in such volume and for such time as to cause flooding for a prolonged period beyond that which normally resulted from heavy rains.

Viewing the testimony in the light most favorable to the plaintiff, we think that the trial judge properly denied the defendant's motion for a directed verdict.

The remaining exceptions charge that the trial judge committed prejudicial error in his rulings on the admissibility of certain testimony.

The defendant sought unsuccessfully to introduce a photograph taken by a witness Scott and also the the testimony of Dr. L. P. Hollis to show flooding conditions in adjacent watersheds to that in which defendant's dam and plaintiff's property were located. There was testimony that a series of mountains in the area separated the adjacent watersheds of North Saluda River, Middle Saluda River, and South Saluda River. These three rivers converge several miles below the defendant's dam. There was, however, no testimony to show that the rainfall in the adjacent watersheds entered the defendant's reservoir or in any way affected the flooding of plaintiff's crop. Under these circumstances, the fact that heavy rains fell in adjacent watersheds or that there were flooding conditions present in those areas could have no relevancy to a determination of the cause of the destruction of plaintiff's crop, and no prejudice resulted to defendant by the exclusion of such testimony.

The final question relates to the testimony of the witness Walter L. Pickell, Jr. He was a consulting engineer and testified for the plaintiff as an expert witness. He gave his opinion as to the cause of the flooding of plaintiff's crop based upon certain assumed facts. At the conclusion of the direct examination, the defendant, without prior objection, moved to strike the testimony of the witness upon the ground that

his opinion was predicated upon facts which were not in the record. The motion was refused and counsel for the defendant then cross-examined the witness subject to the motion to strike. The defendant contends that the refusal of the trial judge to strike the testimony of the witness at the conclusion of the direct examination was prejudicial error.

The foregoing motion was refused because of the failure of the defendant to interpose timely objection to the testimony as it was given.

A motion to strike evidence admitted without objection is addressed to the sound discretion of the court. *Watkins v. Atlantic Coast Line Railroad Co.,* 97 S. C. 148, 81 S. E. 426; *Walker v. Henderson,* 109 S. C. 160, 95 S. E. 337; *Fabian v. Fabian,* 192 S. C. 483, 7 S. E. (2d) 223; *In re Limehouse's Estate,* 198 S. C. 15, 16 S. E. (2d) 1.

We find no abuse of discretion in this case. Ample opportunity existed during the direct examination of the witness for objection to have been made to his testimony or any part thereof considered inadmissible; and no sound reason appears to excuse the failure to enter an objection at that time.

All exceptions are overruled and the judgment of the lower court affirmed.

Affirmed.

Moss, Bussey and Brailsford, JJ., concur.