719 F.2d 1367
 FEDERAL LAND BANK OF ST. LOUIS, Appellee,
v.
John WILSON and Georgia Wilson, Appellants.
The First State Bank of Newport, formerly The First National
Bank of Newport, Arkansas, United States Department of
Agriculture by and through Farmers Home Administration and
Bank of Newark, Appellees.
 No. 82-1535.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 24, 1983.
Decided Oct. 31, 1983.
 
 David Hodges, Little Rock, Ark., for appellant.
 Jerry Post, Batesville, Ark., Donald P. Raney, Lightle, Beebe, Raney & Bell, Searcy, Ark., and George E. Pike, Jr., Friday, Eldredge & Clark, Little Rock, Ark., George W. Proctor, U.S. Atty., Sherry P. Bartley, Asst. U.S. Atty., Little Rock, Ark., for appellee Federal Land Bank of St. Louis.
 Before BRIGHT, ROSS and JOHN R. GIBSON, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 Georgia Wilson appeals from the judgment of the district court[1] rejecting her claims in a foreclosure action. The foreclosure action was an action against the United States pursuant to 28 U.S.C. Sec. 2410. This cause was removed from the Independence County, Arkansas, Chancery Court to the United States District Court pursuant to 28 U.S.C. Secs. 1441(b) and 1444, at the request of the United States of America, acting through the Farmers Home Administration (FmHA). Other parties in this rather involved and complex proceeding are: The Federal Land Bank of St. Louis (Federal), First State Bank of Newport (State Bank),[2] Bank of Newark (Newark), John Wilson and Georgia Wilson.[3]
 
 A. CLAIM OF FEDERAL:
 
 2
 On January 14, 1974, John and Georgia Wilson executed a promissory note to Federal in the sum of $20,000.00 with interest at the rate of 7 1/2% per annum. Under the terms of the note, Federal possessed the option to invoke a variable rate of interest if economic conditions warranted the action. Contemporaneously, the Wilsons executed a mortgage to Federal conveying the following property in Independence County to secure the promissory note:
 
 
 3
 Part of the West Half of Lot 5 of the Northeast Fractional Quarter of Section 5, Township 12 North, Range 4 West, of the 5th P.M., described as follows:
 
 
 4
 Commencing at the Southwest Corner of said Lot 5, thence East 264 feet to the point of beginning, thence North 330 feet, thence East 198 feet, thence South 330 feet, thence West 198 feet to the point of beginning.
 
 
 5
 On February 20, 1980, Federal filed a foreclosure action against the Wilsons in the Chancery Court of Independence County alleging that the Wilsons were in default in their payments on the note, that Federal had elected to accelerate the indebtedness and declare the entire principal indebtedness due, and praying for a judgment against the Wilsons for $21,828.10, interest due and reasonable attorney's fees.
 
 
 6
 Federal made State Bank, FmHA and Newark party-defendants, asserting that these defendants were necessary parties since each claimed a security interest in the property in question.
 
 B. CLAIM OF NEWARK:
 
 7
 On March 10, 1980, Newark filed its answer and "cross-complaint" alleging that on June 19, 1978, John Wilson executed and delivered to Newark a promissory note for $10,500.00; and that on August 22, 1978, John and Georgia Wilson executed to Newark a deed of trust as security for the note to the extent of $7,556.75.
 
 
 8
 Newark alleged that John Wilson had failed to make payments as promised and requested a judgment in rem against the Wilsons for $7,556.75, interest at the rate of 10% per annum from August 22, 1978, and reasonable attorney's fees.
 
 C. CLAIM OF FmHA:
 
 9
 John and Georgia Wilson obtained several loans from FmHA over a seven-year period. The initial loan was extended on January 9, 1974, and the most recent loan was made on February 24, 1978. On June 4, 1979, John Wilson filed a voluntary Chapter 7 bankruptcy petition; Georgia Wilson was not a party to this bankruptcy proceeding. When John Wilson filed his bankruptcy petition, FmHA was the holder of the following three unpaid promissory notes, each of which had been executed and delivered by John and Georgia Wilson:
 
 
 10
 DATE OF NOTE AMOUNT INTEREST RATE
------------- ---------- -------------
Feb. 20, 1976 $32,500.00 8 1/2%
Feb. 16, 1977 16,174.64 8%
Feb. 16, 1977 48,800.00 5%
 
 
 11
 The first two notes were secured by two junior real estate mortgages against the property involved in the foreclosure action (as well as a security interest in the farming equipment and crops of John Wilson and Georgia Wilson). The third note for $48,800.00 was secured only by farming equipment and crops.
 
 
 12
 In the fall of 1979, FmHA sought and obtained the abandonment by the bankruptcy trustee of the farming equipment in which FmHA had a security interest. The abandoned security items were sold at a public auction on February 12, 1980, and the net proceeds were applied to the Wilsons' FmHA account. On the date of the chattel liquidation sale, FmHA was still the holder of the three unpaid promissory notes mentioned earlier: the $32,500.00 and $16,174.64 notes, secured by junior real estate mortgages, and the $48,800.00 note secured only by perfected security interests in farming equipment and crops.
 
 
 13
 Instead of requesting the application of the liquidation sale proceeds to the $48,800.00 loan, which was secured only by the equipment which was sold, the FmHA county supervisor, who did not have custody of the Wilsons' file and assumed all three notes to be secured by real estate mortgages, instructed the FmHA finance office to pay the oldest loan in full and thereafter to pay the balance against the note bearing the higher rate of interest. Consequently, the net sale proceeds were initially credited to retire the $32,500.00 note and pay down the $16,174.64 note.
 
 
 14
 Realizing that the aforementioned allocation of the proceeds from the chattel sale was not in its best interest, FmHA, on January 23, 1981, reallocated the proceeds as follows: $19,573.37 as principal and $5,175.82 as interest to the note of February 20, 1976, and $12,855.57 as principal and $5,181.55 as interest to the note of February 17, 1977. The effect of the reallocation was to increase the unpaid balance on the reamortized note of February 16, 1977, from an unpaid balance of $3,323.49 as principal and interest at 8% per annum to an unpaid balance of $16,174.64 as principal and $6,519.03 as interest; and reduce the unpaid balance on the $48,800.00 note of February 17, 1977, from $26,354.67 as principal and $836.12 as interest to an unpaid balance of $9,130.73 as principal and $310.70 as interest.
 
 
 15
 FmHA did not seek any relief for the February 17, 1977 indebtedness in the foreclosure proceeding, since this note was not secured by the real estate involved.[4]
 
 D. CLAIM OF GEORGIA WILSON:
 
 16
 Mrs. Wilson asserted that she was awarded possession of the real property in question under the divorce decree terminating her marriage to John Wilson; because of this, she maintained that the foreclosure action by the mortgagees, Federal, Newark and FmHA is subordinate to her claim and right to possession of the realty. Mrs. Wilson also challenged FmHA's and Newark's claims, asserting usury as an affirmative defense. The court rejected all of Mrs. Wilson's claims.[5] On appeal, Mrs. Wilson contends that the district court erred:
 
 
 17
 1) in sustaining FmHA's reallocation of proceeds from the sale of certain collateral,
 
 
 18
 2) in excluding certain evidence concerning appellant's financial situation,
 
 
 19
 3) in holding that the Farm Credit Act of 1971 preempted Arkansas' usury laws, and
 
 
 20
 4) in denying appellant's claim to her residence and one half of a soybean crop.
 
 
 21
 I. Reallocation of Proceeds from Chattel Sale
 
 
 22
 The district court found that FmHA was not precluded from reallocating the proceeds from the sale of the farm equipment after discovering the mistake in the initial application. Appellant argues that the court erred; she contends that a creditor cannot change the application of proceeds once an account has been credited. In support of her argument, appellant cites 60 AM JUR 2d PAYMENT Sec. 86 (1972): "By mutual agreement, the debtor and creditor may change the application of a payment * * * but only if the rights of third parties are not prejudiced." In the case at bar, however, there is no risk of prejudice to any third party. The Bank of Newark originally contested the reallocation, but the district court rejected its claim, and the bank abandoned the claim on appeal.
 
 
 23
 A debtor desiring to avail himself of his right to direct the application of a payment must give the direction therefor either before or at the time of the payment; otherwise, the right is lost, because thereafter the money ceases to be his, and is no longer subject to his control. See St. Paul Fire & Marine Ins. Co. v. United States, 309 F.2d 22 (8th Cir.1962), cert. denied, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963). Here, at the time the farm equipment was publicly auctioned, neither of the Wilsons requested that the FmHA appropriate the sale proceeds in any particular manner. A creditor can, absent clear direction otherwise, apply a payment from a debtor to any debt he chooses to maximize his security. Federal Deposit Ins. Corp. v. Freudenfeld, 492 F.Supp. 763, 770 (D.Wis.1980).
 
 
 24
 While it is often said that a creditor lacks the freedom to allocate involuntary payments made by a debtor that he has on receipt of a voluntary, unallocated payment, it is the right of the creditor to apply sums received from the debtor or for his account in such fashion as to give the creditor the utmost advantage of such security as the creditor may possess. And in the absence of any other creditor who would be prejudiced by such an allocation, the courts must respect this right of a secured creditor.
 
 
 25
 United States v. Pollack, 370 F.2d 79, 80 (2d Cir.1966).
 
 
 26
 We are mindful of the fact that reallocation is improper in some instances. Where an application of payment has been made and the debtor notified, the debt is discharged. Only assent of the parties can justify reapplication after the creditor has applied the payment and notified the debtor. Matter of S & W Exporters, Inc., 16 B.R. 941 (Bkrtcy.N.Y.1982). The district court pointed out, however, that the factor distinguishing the above case from the instant case is notice to the debtor. Here, the Wilsons had no notice of the misapplication and reallocation until after this litigation was commenced. In addition, Arkansas law recognizes a presumption that proceeds from a foreclosure sale will be applied to the indebtedness secured by the property sold:
 
 
 27
 When property is mortgaged to secure a debt, and afterwards this property is sold and the proceeds turned over to the mortgagee, the natural presumption is that both parties intend that the payment shall be applied on the mortgage debt, and the mortgagee has the right to apply the payment in that way, even though the mortgage debt be not due.
 
 
 28
 Lyon v. Bass, 76 Ark. 534, 89 S.W. 849 (1905). Furthermore, section III G of the security agreement involving the chattel and crops securing the $48,800.00 note provides in part:
 
 
 29
 Any payment made by Debtor may be applied on the note or any indebtedness to Secured Party secured hereby, in any order Secured party determines. (Emphasis added.)
 
 
 30
 The mere entry of a credit to a particular account is not conclusive evidence of an irrevocable application of the payment in the absence of notice to the debtor. In re Stacy, Wolf Hat Co., 99 F.2d 793 (2d Cir.1938); In re Automatic Equipment Mfg. Co., 103 F.Supp. 427 (D.Neb.1952). In the instant case the district court reasoned that the combination of the state law presumption, the creditor's contractual right and the absence of notice to the debtor provide the legal basis for FmHA's reallocation. We agree.
 
 II. Evidentiary Rulings
 
 31
 Appellant contends that the court erred in excluding evidence regarding her financial situation. The trial court received appellant's testimony that she had no job, assets, or other source of income since her divorce in 1979. The court sustained an objection to the line of questioning; appellant's counsel then stated that he had completed his questioning on that point anyway. Appellant now argues that the testimony was relevant and crucial to the issue of reallocation.
 
 
 32
 The trial court has broad discretion in determining the relevance of proposed evidence, United States v. Johnson, 516 F.2d 209, 214 (8th Cir.), cert. denied, 423 U.S. 859 [96 S.Ct. 112, 46 L.Ed.2d 85] (1975); United States v. Mitchell, 463 F.2d 187, 191 (8th Cir.1972), cert. denied, 410 U.S. 969 [93 S.Ct. 1449, 35 L.Ed.2d 705] (1973), and the admission or exclusion of such evidence will be overturned on appeal only if the court has abused its discretion. United States v. Kills Crow, 527 F.2d 158, 160 (8th Cir.1975) (per curiam).
 
 
 33
 United States v. Williams, 545 F.2d 47, 50 (8th Cir.1976).
 
 
 34
 Aside from a general conclusory allegation, appellant makes no claim that would support a finding of abuse of discretion. In light of the cases cited in the preceding section regarding reallocation, it is difficult to envision how appellant's financial situation is of any consequence when pitted against the rights of a secured creditor. We find no abuse of discretion in the court's evidentiary ruling.
 
 III. Usury
 
 35
 In trial and post-trial proceedings, appellant offered six arguments to prove that the Federal Land Bank's note and security were in violation of Arkansas' usury provision, Article 19, Section 13 of the Arkansas Constitution.[6] The court declined to make a factual determination of whether any of the items listed by appellant generated an interest rate in excess of Arkansas' maximum rate of ten per cent per annum. Instead, the court based its decision on what we consider the pivotal issue: whether Congress intended to preempt the field of state usury laws when it enacted the Farm Credit Act of 1971, 12 U.S.C. Sec. 2001 et seq. The court held that state usury provisions are inapplicable in credit transactions involving Federal Land Banks. Appellant contends that this holding was erroneous, asserting three grounds: 1) that the Federal Land Bank is not a federal government agency, 2) that Congress did not intend to preempt state usury law in passing 12 U.S.C. Sec. 2015, and 3) that there is no conflict between the federal and state law in this situation.
 
 
 36
 The Federal Land Banks were established pursuant to the Farm Credit Act, 12 U.S.C. Sec. 2001, et seq. Federal Land Banks are appendages of the United States. This is clearly stated in 12 U.S.C. Sec. 2011: "The Federal land banks established pursuant to section 4 of the Federal Farm Loan Act, as amended, shall continue as federally chartered instrumentalities of the United States."
 
 
 37
 Appellant's second and third claims are equally lacking in merit.
 
 
 38
 As a general rule, there is no question that, when Congress legislates in an area in which it has constitutional authority, the laws of the states in the same field, to the extent that they are inconsistent with the federal law, must yield. International Union of United Automobile Workers v. O'Brien, 339 U.S. 454 [70 S.Ct. 781, 94 L.Ed. 978] (1950); Hanson v. Union Pacific R.R. Co., 160 Neb. 669, 71 N.W.2d 526 (1955).
 
 
 39
 Beatrice Production Credit Association v. Vieselmeyer, 376 F.Supp. 1391, 1392 (D.Neb.1973). Federal Land Banks set interest rates pursuant to 12 U.S.C. Sec. 2015, which provides:
 
 
 40
 Sec. 2015. Interest rates and other charges
 
 
 41
 Loans made by a Federal land bank shall bear interest at a rate or rates, and on such terms and conditions, as may be determined by the board of directors of the bank from time to time, with the approval of the Farm Credit Administration. In setting rates and charges, it shall be the objective to provide the types of credit needed by eligible borrowers at the lowest reasonable costs on a sound business basis taking into account the cost of money to the bank, necessary reserve and expenses of the banks and Federal land bank associations, and providing services to stockholders and members. The loan documents may provide for the interest rate or rates to vary from time to time during the repayment period of the loan, in accordance with the rate or rates currently being charged by the bank.
 
 
 42
 The statute plainly states that the directors of the bank will set interest rates with the approval of the Farm Credit Administration. There is no reference to state interest rate limits.
 
 IV. Property Claims
 
 43
 Appellant submits that the court erred in denying her claim to possession of her residence unencumbered by the claims of all mortgagees. The court also denied her claim to one-half of the proceeds from the sale of a soybean crop. Appellant contends that she has dower rights in the residence and the soybeans.
 
 A. Soybeans
 
 44
 The district court found that the state court, in dividing the Wilsons' property, intended to award John Wilson all the assets from the farming operation, to the exclusion of any claims of Mrs. Wilson. The divorce decree states: "(8) The Court finds [John Wilson] shall be entitled to the proceeds of any settlement or recovery on pending claims or lawsuits concerning the farming operation." Furthermore, it is settled Arkansas law that a husband may give a chattel mortgage in personalty without the consent of the wife; any dower interest of the wife is taken subject to the lien. Strang v. Strang, 258 Ark. 139, 148-49, 523 S.W.2d 887, 892 (1975).
 
 B. Residence
 
 45
 The district court correctly denied appellant's claim to the residence. Strang v. Strang, supra, is dispositive: " * * * where property subject to division in a divorce case is mortgaged, each takes subject to the mortgage." Id. at 148-49, 523 S.W.2d at 893. The court correctly denied appellant's claim to the property.
 
 
 46
 We find no error in the district court's judgment and accordingly, we affirm.
 
 
 
 [1]
 The Honorable George Howard, Jr., United States District Court for the Eastern District of Arkansas
 
 
 [2]
 State Bank's claims were rejected by the district court; it is not a party to this appeal
 
 
 [3]
 John and Georgia Wilson, the payors and mortgagors on the notes and mortgages involved, were formerly husband and wife. This marriage was terminated by an absolute divorce decree of the Independence County Chancery Court on October 26, 1979
 
 
 [4]
 The real property involved in this action was abandoned pursuant to an order of the bankruptcy court dated January 9, 1980, after the bankruptcy court found:
 (T)here is no reasonable basis to believe there is any equity above liens and that said property * * * is abandoned and disclaimed as an asset in this case.
 
 
 [5]
 Federal Land Bank of St. Louis v. Wilson, 533 F.Supp. 301 (E.D.Ark.1982)
 
 
 [6]
 Section 13 provides:
 All contracts for a greater rate of interest than ten percent per annum shall be void, as to principal and interest.