784 F.2d 1200
 23 ERC 2105, 16 Envtl. L. Rep. 20,503
 L. Boyd STODDARD, Barry T. Terry and Sara M. McDonald, Appellees,
v.
WESTERN CAROLINA REGIONAL SEWER AUTHORITY, Appellant.
L. Boyd STODDARD, Barry T. Terry and Sara M. McDonald, Appellants,
v.
WESTERN CAROLINA REGIONAL SEWER AUTHORITY, Appellee.
 Nos. 85-1584, 85-1590.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 2, 1985.
Decided March 5, 1986.
 
 O.W. Bannister, Jr., Leo H. Hill, Hill, Wyatt & Bannister, Greenville, S.C., John S. Pachter (Christopher L. Rissetto, Daniel E. Toomey, Wickwire, Gavin & Gibbs, P.C., Washington, D.C., on brief), for appellant/cross-appellee.
 Bradford W. Wyche (Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C., Robert L. Stoddard, Moore, Stoddard, Stoddard & Wood, Spartanburg, S.C., on brief), for appellees/cross-appellants.
 Before RUSSELL, SPROUSE and WILKINSON, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 L. Boyd Stoddard, Barry T. Terry, and Sara M. McDonald (landowners) sued the Western Carolina Regional Sewer Authority in district court for enforcement of the Clean Water Act (Act), 33 U.S.C. Sec. 1251 et seq. (1982), under the Act's "citizen suit" provision, 33 U.S.C. Sec. 1365 (1982). In addition, they asserted a pendent state law claim that their property was taken in violation of the South Carolina constitution.[1] The Sewer Authority appeals from the district court's judgment that it is liable for damage to the landowners' property under South Carolina law and from the award of attorneys' fees and costs. The landowners appeal the district court's failure to assess civil penalties against the Sewer Authority under section 309(d) of the Act, 33 U.S.C. Sec. 1319(d) (1982).
 
 
 2
 Stoddard, Terry and McDonald are the owners of farm land in Laurens County, South Carolina. In 1976 Terry's predecessor in title, Stoddard, and McDonald executed easements allowing the United States Soil Conservation Service (SCS) to flood portions of their property in order to construct Stoddard's Lake. They did not demand compensation from the SCS, believing that the presence of a lake would enhance the value of their remaining property. The lake was constructed in 1980. SCS designated the lake, which covers approximately sixty acres, Site 21 Sediment Pool and apparently designated it to reduce sediment flow into a larger lake located downstream.
 
 
 3
 When Stoddard executed the easement in favor of the SCS, he intended to develop his two hundred and twenty acres of lakefront property into a residential subdivision to be known as Holland's Place. In furtherance of this plan, he erected an entrance gate, laid a water line, and constructed a road into the planned development.[2] Terry built a new home on his property because of its proximity to the lake. McDonald developed a picnic site near the lake for family outings and entertaining.
 
 
 4
 The Fountain Inn sewage treatment plant was built in 1967 and has been operating since that time. The plant is located on Stoddard's Creek, approximately three and one-half miles upstream from the landowners' property. The Sewer Authority acquired the plant from the City of Fountain Inn in 1969. In 1977, the South Carolina Department of Health and Environmental Control (Department) granted the Sewer Authority a permit to operate the plant under the Clean Water Act, setting forth effluent limitations for the plant's operation.[3] The Sewer Authority concedes that it violated the NPDES permit limitations. The principal issues presented in this appeal are whether those violations caused the polluted conditions in Stoddard's Lake and, if so, whether the pollution resulting from the plant's discharges constitute a compensable taking of the landowner's property in violation of the South Carolina Constitution.
 
 
 5
 The NPDES permit which the Department issued to the Sewer Authority in 1977 authorized the discharge of treated wastewater into Stoddard's Creek in accordance with the following limitations:
 
 
 6
 (a) Dissolves Oxygen: 5 milligrams per liter (mg/1) (minimum);
 
 
 7
 (b) Total Suspended Solids (concentration): 30 mg/1 (monthly average) and 45 mg/1 (weekly average);
 
 
 8
 (c) Total Suspended Solids (mass): 171.9 lbs/day (monthly average) and 257.8 lbs/day (weekly average);
 
 
 9
 (d) Biochemical Oxygen Demand (concentration): 30 mg/1 (monthly average) and 45 mg/1 (weekly average);
 
 
 10
 (e) Biochemical Oxygen Demand (mass): 171.9 lbs/day (monthly average) and 257.8 lbs/day (weekly average);
 
 
 11
 (f) pH: 6 to 9; and
 
 
 12
 (g) Fecal Coliform: 200/100 milliliters (monthly average) and 400/100 milliliters (maximum).
 
 
 13
 The parameters detailed in the NPDES permit are not pollutants themselves, but serve to indicate the presence of pollutants.[4]
 
 
 14
 In 1978, the Sewer Authority applied for an extension of time to meet the NPDES permit standards. The Department decided not to act on this application to modify the permit, but to wait until the permit expired. A new permit was finally issued in November, 1983, to become effective January 1, 1984. It set forth significantly less stringent discharge limitations except for the pH and fecal coliform parameters.[5]
 
 
 15
 When the Sewer Authority acquired the wastewater treatment plant from the City of Fountain Inn in 1969, the plant, which was designed to treat only domestic waste, had minimal equipment, no chlorination process, and no means to dispose of the sludge remaining after wastewater treatment. A 1976 study recommended a substantial upgrade of the Fountain Inn plant, but because the Sewer Authority chose instead to work toward construction of a regional plant, it did not undertake to upgrade the Fountain Inn plant.
 
 
 16
 Over the years, the proportion of high strength industrial wastewater treated at the plant has increased. Approximately eighty-five percent of the plant's total organic load currently comes from industrial sources. A 1983 Sewer Authority plan acknowledged the presence of "some high strength industrial wastewaters which impose substantial loads on the plant and affect wastewater characteristics." At trial, the Sewer Authority admitted that it had the authority to require these industries to pretreat their wastes, but did not impose such requirements until it adopted a Sewer Use Regulation in June of 1984.
 
 
 17
 In July of both 1981 and 1982 the plant "went septic," experiencing anaerobic conditions resulting in extremely unpleasant odors which caused turmoil in the community. The 1982 breakdown required emergency operations at the plant, including the hauling of excess sludge to other waste treatment plants. Fish kills occurred in Stoddard's Lake in March and May of 1982 and again in May of 1983. The Department suspected discharges from the Fountain Inn plant in two of the kills and attributed the third to an algal bloom.
 
 
 18
 The Discharge Monitoring Reports submitted to the Department by the Sewer Authority showed frequent violations of the NPDES permit for the Fountain Inn plant. On at least two occasions, there was no dissolved oxygen in the discharged water. The average fecal coliform measurement was in violation of the permit every month from January 1979 to June 1983. For twelve of those months, the levels were reported as "too numerous to count." During the same fifty-four month period, the concentration of biochemical oxygen demand reached or exceeded the maximum permitted levels for twenty-nine months, and total suspended solids were excessive for fifty months. At trial, the landowners introduced into evidence nine notices of violation and numerous letters from the Department to the Sewer Authority which rated the operation of the Fountain Inn plant as "unacceptable" and detailed violations noted during the Department's on-site inspections.
 
 
 19
 Finally, in 1983, the Department ordered the Sewer Authority to install a chlorination system on the Fountain Inn plant to control fecal coliform levels.[6] The Sewer Authority undertook an "interim upgrade" of the plant and has been in substantial compliance with its NPDES permit since that time. Nevertheless, the district court found that the plant continues to experience serious operating problems, including the presence of excessive amounts of septic sludge and unacceptably low levels of dissolved oxygen.
 
 
 20
 Stoddard's Creek and Lake have been classified by the Department as "Class B" waters, suitable as a source of drinking water after conventional treatment and for secondary recreational contact such as boating, fishing, and wading. While all lakes eventually fill in and die through a process called eutrophication, this process is normally extremely slow. Human intervention, however, can dramatically speed up the process, resulting in what is known as cultural eutrophication.
 
 
 21
 In cultural eutrophication, high levels of nutrients are added to a lake, dissolved oxygen levels are lowered, and the lake experiences a rapid growth in rooted plants along the shore and algae in the water. Phosporous is a predominant element in promoting the growth of algae, and the district court found that the Fountain Inn plant contributes at least two-thirds of the phosphorous which flows into Stoddard's Lake. Expert testimony at trial indicated that the plant's discharges have caused the premature eutrophication of Stoddard's Lake, resulting in massive algal blooms, fish kills, and odor problems.
 
 
 22
 The district court found that the Sewer Authority has violated the terms of the NPDES permit on numerous occasions. It found from the evidence that discharges into Stoddard's Creek flowing into Stoddard's Lake had created extremely unpleasant conditions at the lake. Frequently odors were so noxious that humans could not remain in the vicinity; algae clumps and human sewage often floated on the surface of the lake. The repeated fish kills were widely reported. The district court found that these conditions were proximately caused by, and are likely to continue to be caused by, the discharge of waste from the plant.
 
 
 23
 The trial court also found that: in the five years since its construction, the lake has prematurely become highly eutropic; even after the polluting conditions are rectified, it will take at least five years for the lake to be rejuvenated; and the numerous excessive discharges and the resulting conditions created in the lake constituted a nuisance and an improper taking of the landowners' property without just compensation in violation of Article I, section 13 of the South Carolina constitution. It awarded damages in the amount of $198,000 to Stoddard, $36,000 to Terry, and $63,900 to McDonald. The court also authorized the recovery of attorney's fees, expert witness fees, and costs upon proper documentation. However, the district court declined to assess penalty fines under the Clean Water Act, stating:
 
 
 24
 Clearly, the common goal is to rectify the situation whether by the modernization of the treatment facility or the construction of a new regional plant. To fine [the Sewer Authority] for these past violations "would merely go to diminish the limited resources which the Authority has to [reach this goal and] comply with ... [this decree]." United States v. Providence, 492 F.Supp. 602, 610 (D.R.I.1980). Therefore, [the Sewer Authority] shall not be fined in this instance.
 
 
 25
 On appeal, the Sewer Authority contends that the district court erred because its sewage discharges were legitimate exercises of police power and there was no "taking" of the landowners' property. It also argues that it was entitled to a retroactive modification of the 1973 permit to the less stringent parameters contained in the permit as reissued in November, 1983, thus removing any doubt as to the legitimacy of its discharges. Alternatively, it argues that if there was a taking, it was only temporary and the damages awarded were excessive. Additionally, the Authority argues that the district court was wrong in awarding damages under a "common law pendent claim" since the federal and state comprehensive regulatory programs provided by the Clean Water Act and its South Carolina corollary preempted the "state common law" remedy. Finally, the Sewer Authority argues that the landowners are not entitled to attorneys' fees and costs because they did not prevail on the Clean Water Act aspects of this litigation, and the landowners' suit did not further the public interest.
 
 
 26
 The landowners assert on appeal that the district court erred in not assessing any civil penalties against the Sewer Authority, in light of the court's rejection of each of the defenses put forward by the Authority.
 
 I.
 
 27
 The Sewer Authority argues that the public right to pollute streams for sewage disposal is superior to a citizen's riparian right to use public water. It contends that such disposal is a legitimate exercise of the superior governmental power.[7] The Authority is, of course, correct in its initial premise that a legitimate sewage discharge can be a proper exercise of a government's police powers. See Ancarrow, 600 F.2d 443. The Clean Water Act, however, imposes a severe limitation on the right to discharge sewage or other pollutants into the nation's waterways. 33 U.S.C. Sec. 1251(a). Moreover, the landowners' action for damages under the pendent state claim is bottomed on the South Carolina Constitution, which provides that private property shall not be taken for public use without just compensation. S.C. Const. art. I, Sec. 13. There is, of course, a tension between the Sewer Authority's exercise of police powers and the constitutional right of the landowners to be free from an improper taking. The issues underlying the tension have been resolved, however, by the Supreme Court of South Carolina.
 
 
 28
 The state court has held that the taking provision of the South Carolina Constitution does not require a landowner to prove physical invasion of his property in order to recover. He will prevail if he simply establishes that his property has been damaged or that he has been deprived of the ordinary beneficial use and enjoyment of his property. Spradley v. South Carolina State Highway Department, 256 S.C. 431, 434, 182 S.E.2d 735, 737 (1971); South Carolina State Highway Department v. Wilson, 254 S.C. 360, 366-67, 175 S.E.2d 391, 395 (1970); Gasque v. Town of Conway, 194 S.C. 15, 21, 8 S.E.2d 871, 873 (1940); Parish v. Town of Yorkville, 96 S.C. 24, 25, 79 S.E. 635 (1913).
 
 
 29
 In South Carolina, moreover, when a governmental entity maintains a nuisance and interferes with the use of private property, the landowner may recover damages for a taking of the property. The Supreme Court of South Carolina has held: "a governmental body, although otherwise immune from liability, loses that immunity if the danger which caused the harm is in fact a nuisance." Teaque v. Cherokee County Memorial Hospital, 272 S.C. 403, 405, 252 S.E.2d 296, 297 (1979).[8] The South Carolina courts have broadly defined what constitutes a nuisance. See State ex rel. Lyon v. Columbia Water Power Co., 82 S.C. 181, 191, 63 S.E. 884, 889 (1909); Lever v. Wilder Mobile Homes, Inc., 283 S.C. 452, 322 S.E.2d 692 (S.C.App.1984). In Lever, the South Carolina court held that the question of whether a nuisance exists is an issue for the fact-finder. Moreover, that decision held that: "[i]n South Carolina 'anything' working inconvenience or damage or interfering with the enjoyment of life or property is a nuisance. More to the point, it is a nuisance to use property in such a way that annoying or injurious odors are emitted." 283 S.C. at 454, 322 S.E.2d at 693-94 (citation omitted).
 
 
 30
 In this case the trial court found that the foul odors, human sewage, dead fish, algal growth, and other conditions created by the Sewer Authority amounted to a taking of the landowners' property. In view of the overwhelming evidence, we cannot say this finding is clearly erroneous. See Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The Sewer Authority was licensed to treat sewage before discharging it into public waters. Its purpose was legitimate. The Authority exceeded its legitimacy, however, by the massive violation of the permits' permissable discharge standards. The district court found that, from 1979 to 1983, the Sewer Authority operated the Fountain Inn plant as if the NPDES permit did not exist. The plant regularly exceeded the permit's limits on the biological oxygen demand, total suspended solids, dissolved oxygen, pH and fecal coliform parameters. The Authority allowed the discharge of alarming amounts of fecal coliform, even though installation of a $50,000 chlorinator would have brought the plant into compliance. There is no question that the Sewer Authority abused its powers and was guilty of creating a nuisance. It is equally clear that the district court correctly interpreted the decisions of the Supreme Court of South Carolina as holding the creation of such nuisances amounts to taking under Article I, section 13 of its constitution.
 
 II.
 
 31
 The Sewer Authority contends, however, that the South Carolina regulatory scheme enacted pursuant to the authority of the Clean Water Act preempts the "common law" remedy awarded to the landowners by the district court. The Authority relies on the Supreme Court's holding in City of Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (Milwaukee II), that there is no federal common law remedy for interstate water pollution because the Clean Water Act occupies the entire field of water pollution, insofar as federal standards are concerned. Id. at 317, 101 S.Ct. at 1792.[9] The Clean Water Act replaced the federal common law because, "it is for Congress, not federal courts, to articulate the appropriate standards to be applied." Id. See also Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).
 
 
 32
 A validly enacted federal law can, of course, preempt any state law, including a provision of a state constitution in proper instances. Federal Land Bank of St. Louis v. Wilson, 719 F.2d 1367 (8th Cir.1983); see also Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Before the Supreme Court finds that state law has been preempted, however, a clear and manifest congressional purpose must be found, and the Court's analysis includes due regard for the concepts of federalism. Milwaukee II, 451 U.S. at 316-17, 101 S.Ct. at 1792; Rath Packing, 430 U.S. at 525, 97 S.Ct. at 1309. We see nothing in the Clean Water Act that presages a congressional intent to occupy the entire field of water pollution to the exclusion of state regulation. The Act specifically provides that pollution be controlled by state law if that law satisfies the federal act. South Carolina has adopted just such a statute, the South Carolina Pollution Control Act, S.C.Code Ann. Sec. 48-1-10 et seq. (Law.Co-op.1976).
 
 
 33
 The Sewer Authority would have us hold that the South Carolina statute supplants state common law remedies in a fashion analogous to the reasoning in Milwaukee II. The Authority's argument, however, fails to adequately address the fact that in developing its regulatory scheme, South Carolina has specifically preserved remedies other than those provided by the state statute. Section 48-1-240 of the South Carolina Act provides:
 
 
 34
 It is the purpose of this chapter to provide additional and cumulative remedies to abate the pollution of the air and waters of the State and nothing herein contained shall abridge or alter rights of action in the civil courts or remedies existing in equity or under the common law or statutory law, nor shall any provision in this chapter or any act done by virtue of this chapter be construed as estopping the State, persons or municipalities, as riparian owners or otherwise, in the exercise of their rights under the common law, statutory law or in equity to suppress nuisances or to abate any pollution. (emphasis added.)
 
 
 35
 This "savings clause" is much broader and stronger than the parallel federal provision. 33 U.S.C. Sec. 1365(e). We cannot imagine a clearer legislative expression retaining the right to remedies such as the one granted here by the district court. Neal v. Darby, 282 S.C. 277, 285, 318 S.E.2d 18, 23 (S.C.App.1984); see also Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979).
 
 III.
 
 36
 We are equally unimpressed with the Sewer Authority's argument that, if there was a taking, the taking was only "temporary." The uncontradicted evidence shows that, due to the Authority's pollution, the lake and the land immediately surrounding it have been essentially unusable since the lake was constructed in 1980. The evidence is also clear that the lake will not recover for at least five years after the excessive pollution has been eliminated. It is uncertain exactly when that elimination will occur, but it is at least several years away. The finding of the district court that the pollution amounted to a permanent taking was not only not clearly erroneous, but indeed is based on preponderating evidence. See King v. United States, 427 F.2d 767, 192 Ct.Cl. 548 (1970); Kline v. City of Columbia, 249 S.C. 532, 155 S.E.2d 597 (1967); Lindsey v. City of Greenville, 247 S.C. 232, 146 S.E.2d 863 (1966).
 
 
 37
 Alternatively, the Sewer Authority asserts that its permit should have been amended so as to have a retroactive effect, making the less stringent parameters of the new permit applicable to post-1978 discharges. Such an amendment, it argues, would have brought it in compliance with its permit during all of the involved period. As we indicated earlier, the Authority's permit violations were massive. Even under a permit amended to the less stringent limitations, it still would have been guilty of many violations, particularly of the fecal coliform parameter. There is no logical interpretation of the relevant law which would entitle the Sewer Authority to a retroactive amendment of its permit in such a way as to absolve it of most of its violations.[10]
 
 
 38
 The Sewer Authority correctly points out that the Clean Water Act provides for an extension of time to achieve permit limitations under certain circumstances. 33 U.S.C. Sec. 1311(i)(1) (1982).[11] However, those circumstances do not apply to the Fountain Inn plant. The Sewer Authority never asserted that it was engaged in any construction which would achieve the NPDES limitation. The district court found that the Authority never sought federal financial assistance for such construction. Thus, the Sewer Authority failed to satisfy either condition by which it might have been granted an extension of time to comply with its NPDES permit.
 
 
 39
 In short, the district court properly characterized the damage to the landowners' property as permanent and correctly ruled that the Sewer Authority was not entitled to a retroactive modification of its NPDES permit. Furthermore, we cannot say that the district court was clearly in error in determining the amount of damages in light of the numerous injuries to the property.
 
 IV.
 
 40
 The district court refused to assess a fine against the Sewer Authority because it believed that levying the statutory penalties would merely diminish the resources available to correct the problems caused by the discharge from the Fountain Inn plant. The landowners dispute this ruling.
 
 
 41
 Section 309(d) of the Clean Water Act states, "[a]ny person who violates ... any permit condition or limitation ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation." 33 U.S.C. Sec. 1319(d) (emphasis added). This language leaves little doubt that, under the circumstances of this case, a penalty in some form is mandated. Liability under the Clean Water Act is a form of strict liability. United States v. Earth Sciences, Inc., 599 F.2d 368 (10th Cir.1978); United States v. Amoco Oil Co., 580 F.Supp. 1042 (W.D.Mo.1984). Clearly, a fine must be imposed when the violations have been as pervasive as those perpetrated by the Sewer Authority during the extended period from 1977 to 1983. We hold that the district court committed an error of law by failing to assess civil penalties in some amount. The amount of the penalty to be levied is, of course, discretionary with the court. State Water Control Board v. Train, 559 F.2d 921 (4th Cir.1977). On remand, the trial court may consider the fact of the substantial award of damages in the pendent claim and the need to apply available resources toward correcting the plant's problems.
 
 V.
 
 42
 The Sewer Authority's final contention is that the district court erred in awarding the landowners their costs and attorneys' fees. The Authority urges that because the landowners were only awarded damages under the pendent state claims, they did not prevail under the Clean Water Act and thus are not entitled to either attorneys' fees or costs. Ruckelshaus v. Sierra Club, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). This argument fails, however, in light of our holding that the case must be remanded to the district court for the assessment of civil penalties. The landowners have substantially prevailed under the Clean Water Act even without considering the damages awarded under their pendent South Carolina claim.
 
 
 43
 Section 1365(d) of the Act authorizes the award of costs and reasonable attorneys' fees whenever the court determines that such an award is appropriate. The Authority argues that the award of attorneys' fees in this case was not "appropriate" because the landowners' suit did not help further the goals of the Act. We find no merit to this contention. The Department did little to enforce the terms of the plant's NPDES permit, despite repeated violations by the Sewer Authority. Faced with the Department's failure to enforce, the landowners' only recourse was in the courts. The landowners have pursued and obtained remedies under the Act in the manner provided for by section 1365, and their actions will tend to ensure compliance with the Act in the very manner contemplated by Congress in enacting this provision. Metropolitan Washington Coalition for Clean Air v. District of Columbia, 639 F.2d 802 (D.C.Cir.1982). Therefore, the landowners have served the public interest by insisting that the Clean Water Act be adequately enforced. See Alabama Power Co. v. Gorsuch, 672 F.2d 1 (D.C.Cir.1982).
 
 
 44
 The judgment of the district court is affirmed insofar as it found the Authority created a nuisance which resulted in a taking of the landowners' property in violation of South Carolina constitutional prescription, and in its award of damages, attorneys' fees and costs to landowners. The district court's decision not to assess civil penalties against the Sewer Authority is reversed, and the case is remanded to the district court with directions to assess such penalties in an amount considered by it to be appropriate.
 
 
 45
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The constitution of South Carolina, provides:
 Sec. 13. Taking Taking private property.
 "Except as otherwise provided in this Constitution, private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor." S.C. Const. art. I, Sec. 13.
 
 
 [2]
 The district court received evidence in the form of expert testimony regarding five real estate transactions which occurred after the development of the lake on the issue of the value of the lakefront property. The court found that the landowners reasonably assumed and expected that the development of Stoddard's Lake would increase the value of their property and that the polluted conditions created by the Sewer Authority's operation of the Fountain Inn plant deprived them of these reasonable expectations
 
 
 [3]
 The Department is the authority designated by the United States Environmental Protection Agency to administer the National Pollutant Discharge Elimination System (NPDES) permit program in South Carolina. See 33 U.S.C. Sec. 1251(b). Publicly owned wastewater treatment plants are required by the Act to operate in compliance with the limitations of their NPDES permits. 33 U.S.C. Sec. 1311(b)(1)(B)-(C) (1982)
 
 
 [4]
 Dissolved oxygen is essential to aquatic life, and low levels indicate the presence of waste loads which consume oxygen in the process of being assimilated by the water body. Biochemical oxygen demand measures the amount of oxygen consumed through the oxidation of waste to carbon dioxide and water; it also indicates the amount of organic material present. The term fecal coliform refers to a group of bacteria which indicates the presence of pathogenic microorganisms. These microorganisms can cause various diseases such as typhoid fever, amebic dysentery, salmonellosis, gastroenteritis, and cholera. In addition to the limitations on specified parameters, the permit prohibited the discharge of floating solids or visible foam and the causing of a visible sheen on the receiving water
 
 
 [5]
 The revised limits of the NPDES permit, effective January 1, 1984, are:
 (a) D.O.: 2.0 mg/1 (minimum);
 (b) TSS concentration: 100 mg/1 (monthly average) and 150 mg/1 (weekly average);
 (c) TSS mass: 260 lbs/day (monthly average) and 390 lbs/day (weekly average);
 (d) BOD concentration: 50 mg/1 (monthly average) and 75 mg/1 (weekly average);
 (e) BOD mass: 130 lbs/day (monthly average) and 195 lbs/day (weekly average);
 (f) pH: 6 to 9;
 (g) Fecal Coliform: 200/100 milliliters (monthly average) and 400/100 milliliters (maximum).
 
 
 [6]
 Chlorination is the most widely accepted method of reducing fecal coliform levels. This technology was widely available when the Sewer Authority acquired the Fountain Inn plant and apparently could have been installed for less than $50,000
 
 
 [7]
 The Sewer Authority relies on cases from a number of jurisdictions which deal with various types of governmental activity. Those most closely related to the circumstances of this case include: United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945) (riparian owner not entitled to compensation for deprivation of access by authorized governmental activity); Ancarrow v. City of Richmond, 600 F.2d 443 (4th Cir.), cert. denied, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979) (Virginia riparian owner not entitled to damages for diminished value because of pollution of water by municipality); Brabham v. City of Sumter, 275 S.C. 597, 274 S.E.2d 297 (1981) (mere diminution of value of land due to zoning ordinance did not constitute a taking); Rice Hope Plantation v. South Carolina Public Service Authority, 216 S.C. 500, 59 S.E.2d 132 (1950), overruled on other grounds, 329 S.E.2d 744 (S.C.1985) (power of state as to riparian rights substantially same as United States government)
 
 
 [8]
 Because the Sewer Authority does not have liability insurance coverage, it is still generally exempted from liability under the doctrine of sovereign immunity until July 1, 1986. After that date, sovereign immunity will no longer be a viable defense in South Carolina. McCall v. Batson, 285 S.C. 243, 329 S.E.2d 741 (1985)
 
 
 [9]
 The Supreme Court specifically recognized that the Act allows the states to establish standards which are more stringent than those which are federally mandated. Milwaukee II decided whether the Act left room for federal common law, "not whether that law pre-empts state law." Milwaukee II, 451 U.S. at 319 n. 14, 101 S.Ct. at 1793 n. 14
 
 
 [10]
 We are not convinced that compliance with the NPDES permit would necessarily have provided an absolute shield to the Sewer Authority. In South Carolina, a governmental authority is liable for its nuisance caused damages even if there is no negligence on the part of the government. Sheriff v. City of Easley, 178 S.C. 504, 183 S.E. 311 (1936). Since, however, the Authority was almost never in compliance with its NPDES permit, we need not reach this issue
 
 
 [11]
 The statutory language provides for an extension
 [w]here construction is required in order ... to achieve limitations under [subsections of the Clean Water Act], but (A) construction cannot be completed within the time required in such subsection, or (B) the United States has failed to make financial assistance under this chapter available in time....
 33 U.S.C. Sec. 1311(i)(1).